If you could call our case. 18-17-5, Florida, Toronto, a person filed a similar charge. The estate in person at the time of hearing is a disabled person. Witnesses, Damian Slavin and Gerald Bowman. Okay, counsel who are going to argue would approach the bench. A couple of the usual suspects, so identify yourself for the record. Good morning, your honor. Okay, the usual rules. We don't have another case, so if you go a little long, you go a little long. But 15-15 saves some time for rebuttal. The microphone's not so much for amplification as recording, but keep your voice up, okay? And Judge Smith isn't here, but I might occasionally just try to channel him. So I'm going to turn his chair toward me. All right. Please proceed. Good morning. My name is Eugene Hardiman. I represent the two plaintiffs in this case, Gloria Tirado and Christian Tirado. They are the plenary guardians of the estate in person of Gina Gutierrez, a disabled person. Gloria is the mom, and Christian is the son of the disabled person. This, as we know, is a medical malpractice case. The treatment begins back in 2011 when there's a diagnosis of a small cyst in Gina's lower back attached to the spine that resulted in a surgical removal. The inpatient stay was supposed to be one day. One day it was extended to two days. She was admitted on June 21, 2011, discharged two days later on the 23rd.  She presented to UIC a second time on July 5th, later in the evening around dinnertime, and then she was admitted early on the 6th of July. By the 8th of July, Gina had sustained profound neurological damages. That's within a couple of weeks of her initial stay at UIC, where it was supposed to be a relatively routine procedure for a neurosurgeon to remove the lower cyst. As of the 8th of July, she, according to Dr. Merrick, one of our damage experts, that she had profound neurological damage caused by cerebellar tonsil herniation and compression on the brain. I'm going to talk a little bit about the damages. It's not going to be exhaustive. There's a reason. I wouldn't spend much time there. That's correct. There is one reason I'm going to talk about it, though, because I want to mention the cases of Lennard and Mascarello having to do with a special category of plaintiffs. Okay. She's now 47 years old, born on January 18, 1972. She has incomplete quadriplegia, loss of use of the forelimbs. She's confined to a wheelchair. Her hands are clawing now, so they're essentially of no use. She's unable to feed, groom, bathe, or dress herself. She's unable to ambulate. Various problems such as blurred vision, insomnia, depression, increased risk for diseases. She requires rehabilitative and medical care 24 hours a day. The reason I mention these disabilities is that I had cited two cases, the Lennard appellate court case and Mascarello, the Illinois Supreme Court case, that dealt with minors. But what it held was that the courts, at any level, regardless of whether an objection is waived or whether the error is preserved, the courts are under duty to these special type plaintiffs to address any type of irregularities. Even if you're there in the courtroom pressing the mute button time after time after time? That's correct. Don't do anything to secure the record? Don't let the word objection come out of your mouth during what you are now claiming is a critical moment in the litigation? Well, I believe that any irregularities are supposed to be addressed, regardless of whether an objection is made or whether the alleged error is preserved. I think you're asking for a lot, especially in a case where you come to us and say that the trial court's decision to deny your motion for a mistrial should be reviewed by us on de novo as opposed to abuse of discretion. Where do you get that from? I get that from the Campbell case. In the Campbell case, there are a couple of excerpts from the Campbell case that are critical to our appeal. Number one, that unlike what the trial court thought here, that there was actually physical, hands-on CPR resuscitation efforts. Let me just ask you about your prior point, however. I think what you're making reference to is your position that minors, and I think you're arguing disabled adults, are entitled to favored status in the eyes of the law, regardless of forfeiture or waiver or any other principles of law. Is that what you're arguing? That's how I read the Illinois Supreme Court case of Muscariel. Thank you. Now, to the extent we can address the specifics in this case, the Campbell-Illinois Supreme Court case held that defendant doctors attempt to render immediate treatment. And that was during opening statement or very, very early in the case? That was early in the case, yes, Your Honor. You took the juror out of the seat and put him on the counsel table? To the counsel table, exactly right. And then the juror basically, any problem was resolved, and she was okay upon reaching the counsel table. There was an immediate motion for mistrial in that case, was there not? There was. There was. And if ‑‑ Shall I ask you now or should we wait? Why was there not one in this case? I waited. It was at the ‑‑ probably the latter part of my opening statement. Everybody, my opinion, everybody was in shock. The judge at that point in time, the trial judge, said that the defense counsel should not be in the courtroom, in the jury room, rather. That's not what we're talking about. What we're trying to get to is if you read the record and you're making your closing argument, Judge Vargas says we need to take it at recess, and that's when the juror is sort of seen to be listing about. And there's a break taken, and during that break, all of these things occur. Your colleague, your opponent, goes into the jury room, checks to see if the juror has a pulse and is conscious, conveys the information that she's conscious. Whatever occurred, and then paramedics were called, and the decision was made. Do you want to stay? Do you want to go? Because she's had these kind of things before. She decides to go, and an alternate juror is put in place. And the next thing that's in the record is we go from we need to take a break to you restarting your closing argument. There's not a syllable. There's not a word. There's not a sentence or a paragraph in which you attempt in any way, shape, or form to secure the record that this court of review could look at to determine in real time whether or not the court might have abused its discretion in denying a timely motion for mistrial. So you don't make a timely motion for mistrial. You don't secure the record. You come back the next morning when the jury's been deliberating about an hour or so, not even an hour, and move for mistrial in rather dramatic fashion. It seems a little late. My opposition here is that there was sufficient objections by the court and made at the time of the occurrence based upon the affidavits that were filed and the transcripts from the motion for mistrial and the post-trial motion. What happens is it's a sudden event where the defense counsel and doctor and a related nurse come diagonally across in front of the jury. The defense counsel even admitted that she had run across the room and went into the jury room. So there's no opportunity for objection at that point in time. Then Judge Varga undisputedly says that defense counsel shouldn't be in there. Get her out of there. So I, as plaintiff's counsel- Now, I'm just talking about before you go back and resume your argument. I mean, to me, reading the record, you go from we're going to take a recess and then you resume your closing argument and you ask for $50-some million. It seems like you were pretty confident about your case and wanted to keep going with your case. You had plenty of time and opportunity to say whatever you wanted to say and to get the conversation started to make sure that the record was clear and could put the court in a position where the court would best be able to make a ruling on a motion for mistrial, but you never made one. Well, the cases cited here are that if there's a motion for mistrial, it just has to be made before a verdict is rendered. I think all the cases are clear on that. Can I ask you a question? Yes. This is kind of a good situation that we don't ordinarily see, at least I don't, in my best experience of two months. You actually tried the case. I did. So I have a question. Yes. What's the time lapse between the juror getting sick and the jury then going out to begin their deliberations? How much time passed? The juror gets sick and the defense counsel estimated the time of arrival of the spy. I'm asking you. How much time passed? You're talking 45 minutes, an hour? At least 25 minutes, perhaps. Only 25 minutes? Well, the defense counsel estimated the arrival time at 25 minutes. No, I'm talking about the juror getting sick and closing arguments, ending, and the jury beginning their deliberations. Well, I don't believe the jury began deliberations. Well, the jury going into the jury room after they'd been instructed by the court. Well, 25 minutes for the arrival, and then I would think 45 minutes or so minimum. Minimum 45 minutes. Estimated. And in all that time, not one motion of any sort, much less a motion for mistrial, was made when you say in your brief that the events were so extraordinary and chaotic. I quite frankly find that hard to believe. If they're so extraordinary and chaotic, why did you not then make a motion for mistrial? I actually conferred with my clients after the ‑‑ and I told the judge the next morning I conferred with my clients as to whether we should go ahead with a motion for mistrial and based upon what had happened. And on the record, you were instructed by your clients to present the motion. I was. After a discussion with them, it was the end of the trial. Nobody wants a mistrial at the end of the trial. I understand that. But I also knew the law on making a motion for mistrial, that if I did it before a verdict was rendered that I was on solid ground as part of the case. There's plenty of law that says a motion for mistrial has to be made contemporaneously also. But how are you going to persuade us that no reasonable judge in his or her right mind would have denied the motion for mistrial, which is essentially, colloquially put, essentially what the abuse of discretion standard would require you to convince us of. Give it your best shot. Well, I believe this was an extraordinary situation after practicing for 40 years. I had never seen anything like it. The Campbell case was the only analogous case I could see where this had happened, assisting a six-juror. So you're saying it was strategy that you did not make a motion for mistrial? Strategy? No, I believe I made a sufficient – there were sufficient objections at the time of the event that if sufficient objections are made, I don't believe that a motion for mistrial has to be made. What you said in the argument of the post-trial motion is that by you saying she doesn't belong in there or she should get out of there, if that's not an objection, what is? Right? I believe that. Yeah. And also the judge's – Objection is the word, objection. You made one during her closing argument, one. I looked in the, you know, the word search at the end of the transcript for the term objection. I think there were like 22 of them, 21 of them were your colleagues, and one was yours. Okay. But nothing related to the possibility of a mistrial. I believe that the word objection doesn't have to be used. I believe an objection is a statement of opposition. The statement that you're talking about, that statement in and of itself was not on the record. Again, that was during that period of time from where the judge says we'll take a recess and then later where you resume your argument. When you made the statement that she, your colleague Ms. Arrigo, shouldn't be in there, that was not on the record. You never secured it on the record. You didn't tie it up into any complaint or problem that you had with the proceedings and didn't bring it to the attention of the court that this is something that ought to be dealt with. I think you sat on your hands. I think you forfeited it. It was uncontroverted that I said that. And it's undisputed that the judge said she shouldn't be in there also, even before he directed me to get her out of the jury room. That's uncontroverted in any of the – If she had given CPR and brought the patient, the juror, back to life, I might be a little bit more concerned about the possibility of drama. But the judge very specifically in the hearing on your motion that was brought a half hour before and the jury comes back with a not guilty, he very clearly said that he didn't feel that there was any real emotion, no drama, and he felt that the jurors were taking it in a matter-of-fact way. There was nobody crying. There were no signs that they were upset. And the woman herself came to and it was something that had happened to her before. So there's nothing that we can lean on coming from the court that would be consistent with this having the type of drama or emotion that you're trying to suggest that it had. I think there were two parts to this, Your Honor. The first part is that when a party assists the juror, they're going to be put in a favorable light. The second part is that when the court directs me to do something, to get counsel out of the room, my standing outside of a jury room and saying, you must get out, you have to get out of there now, Ms. Regal, that puts me in an unfavorable light. So that's even more. There's more reason why you should say, Judge, I move for mistrial. I mean, seriously. My position is that the objections and the rulings by the judge to get her out of the room, and just based upon the facts being similar to Campbell, that it was sufficient. It's sufficient as an objection. My understanding has been that I don't have to make a motion for mistrial. In Campbell, there was a motion, an immediate motion for mistrial. But my understanding is that I could be here before you based upon the unusual events without even having had filed the motion for mistrial, which was presented to the court before the jury began deliberating the following morning when they came in. I don't think your colleagues would agree with that statement, and I don't see a case that would support that. I just believe that it was extraordinary. We have a disabled person here. I think the objective is to obtain a fair trial for Gina. I don't think that was had in this situation. I just look at it as a person who's tried these cases for nearly 30 years. When you went back in and gave your closing argument and asked for $50 million, you had all the confidence that a competent trial lawyer of your experience would have that you were going to win this case. And then in the morning when you come back over, something had happened in between to make you think that maybe there was a problem. I mean, it wasn't a situation where you talked to the alternate juror, was it? No. Or to the juror who got sick and went home? No, no, I didn't speak to the other juror. That's permissible. No, I didn't do that. I don't think that the delay from 6 o'clock on Thursday night until 8.30, 9 o'clock the following morning, should determine the outcome of this case. You told the trial judge that you were making the motion at the behest of your clients. I spoke to the client, and we discussed it, and my opinion was that it was an extraordinary event that I had never seen before. Can you give your opinion a change from the night before to the following morning after you talked to your clients? No, I believe the objections were sufficient at the time of the unusual events to preserve that point for appeal. In other words, judge, these are unusual events. Judge, this jury's contaminated. All you said, you said nothing about it at all. But the next morning we did. We went over it in detail. Before the jury deliberated, we had argued this motion. I think we're going to hear in just a few moments about how, really, these events weren't that extraordinary. They weren't that chaotic. It wasn't that unusual. And I think maybe that's not an unfair inference. If the attorney or the plaintiff is not bringing this to the attention of the judge, whose responsibility is it? Again, the judge, it happened so fast that they went into the room. The judge saying she shouldn't be in there. The judge ordering me to get out of the room in front of the jury, and the jury stayed in the room the whole time, unlike Campbell, and that I'm telling her to get out. She's assisting. She comes out of the room, announces to the court that the sick juror is okay, reasonably appearing that she had done something to save this juror, who had been, when people are yelling that she's unconscious and can't breathe, and then this announcement that she's okay, there's an inference that counsel assisted her. Your colleague supplied the court with an affidavit that didn't indicate that she revived this patient, did it? No. What is undisputed is she went in after somebody said she's unconscious and can't breathe, knelt down over the sick juror, checked her pulse. The juror woke and spoke some words that we don't know what was said. And the juror communicated some information that she had a preexisting condition that exposed her to having situations like this from time to time. Is that accurate? Yeah. When the judge and counsel and I talked to the sick juror, it's a disorder where there's high anxiety or stress level, she can faint or have other types of symptoms, which she told us about. I just think that if all of these concerns were brought up contemporaneously, right at that moment, while the jury is sitting in the box, and you bring up all of these things and say, judge, in light of all of these, in my opinion, rather dramatic things that occurred, I think that we need another jury, we need to retry this case, you'd be in a better position of saying that the judge should have granted the motion for mistrial. I don't think that the lapse of time had any effect that should determine the outcome of this appeal. So from 6 o'clock on Friday night when the jury goes home until 8.30 or so the next morning before they deliberate. Friday night, Saturday morning? I think it was Thursday, Friday. Did I say Friday? Yeah, you said Friday. No, no. I don't think you could get Varga in there on Saturday. I don't think so. Possible. I don't think so. Okay. Okay. Anything else? Well, my second point was that the actual interaction between counsel and the juror constituted an ex parte interaction, and that in that situation where there's some extraneous type of events outside the evidence, that would constitute ex parte interaction, and that that's sufficient in and of itself for reversible error. Why did you not ask the judge to question the jury? I didn't even think of questioning the jury at that point in time. What effect, if any, did this have on you, Madam Juror? Well, as we know in the Campbell case, they did void the other jury. Right. And they said they would not be prejudiced or influenced by what happened, and the Illinois Supreme Court said that the unfavorable. No, we're very familiar with that case. You're not suggesting that that's why you didn't make that request, are you? No, no. But what I'm saying is I don't think it would matter. Wouldn't that be helpful for a reviewing court examining this record to know what, if any, effect this had on the jury? Possibly, but not determinative. So there's an ex parte. I'm not talking about intentions of counsel and what she did. I'm not talking about intentions. I'm talking about the effect on the jury, that it was probably immeasurable if I was on the jury. Even as a plaintiff's lawyer, it would probably influence me. But you didn't ask the judge to ask the jury anything? You didn't get any affidavits from the jurors? Yes. I mean, this is special. I did. Okay. There's an affidavit from the juror. That's one of the 12 affidavits that that. Tell us about that. Yeah. Mr. Hollis was one of the jurors who signed an affidavit. Right. The two jurors that were in there, the sick juror and the other juror, with respect to specifically what went on in that jury room. You don't have any affidavits to that? No. I had a jury consultant try to contact everybody, the only one who responded. But, again, when would the greatest, most convenient time to do that be, contemporaneous with the events occurring? I believe that the case law, well, first of all, the intentions or effects on the jury that it's evident from the unusual occurrence itself. And the Wolf case actually held that the same way, that you don't have to prove through the jurors that there was prejudice. You don't have to prove that the intentions of counsel were a certain way. It's the effect of the unusual occurrence that mandates a new trial. Thank you. Thank you very much. Judge, I do. I had other points. Okay. I know my time's gone. I think I've covered it fairly well in my brief. Yep. Okay. Mr. Grant. Good morning, Your Honors. Again, Karen DeGrant for the defendants. May it please the Court, counsel, it's true damages don't have anything to do with this. And as far as this Muscarello and Leonard case that plaintiff included in plaintiff's reply, not in the initial brief, those cases don't really apply to the situation. And Muscarello, that's the Supreme Court case, it drew a distinction between cases where there's affirmative misconduct by the non-moving party on a subject that is directly related to the case, to the issues in the case, to the substantive issues in the case, where the court overlooked a waiver to an extent. So I don't believe that those cases have any application here. And I, you know, I think the court raised many of the same issues that we raised. I'm not going to go through and repeat every question that the court raised, but I will reinforce a few topics. And that is, and, you know, reading through this, it seems to me that the absence of any objection means two things, especially with such an experienced counsel, which is either that there should be a conclusion of waiver or that there was no chaos and no prejudice, just as Judge Varga found. And that certainly seems to be the conclusion here. One point that I'd like to emphasize to the court, as far as, you know, the absence of a record, the absence of a court reporter during the proceedings, the absence of any sort of voir dire to develop what happened, the absence then after the notice of appeal is filed to seek a bystander's report. We're not only missing an account of the events when the juror became ill of her own accord, walks into the jury room and so on and so forth, but we are missing an account of the colloquy with the judge and Ms. Fisher after she was feeling better and all of the attorneys who went into the room, there's no court reporter there, and at that time everyone agreed, everyone agreed, that the case could go forward either with Ms. Fisher back on the jury or she could go home. And so, you know, again, this really underscores the absence of any account of what happened in the jury room when the court is, you know, once again presiding over sort of a colloquy with the parties, with the party's attorneys. I think that that really underscores the necessity of a record. And the bystander's affidavit is, or the bystander's report is the appropriate way of handling the situation when there is no record during the trial by a court reporter. And, you know, this is not a here's all of my affidavits, which is fine to provide at the time of a post-trial motion. There were affidavits from both plaintiffs and plaintiff's counsel and family members and referring counsel and their medical consultant. That's fine. They all said what they wanted the court to know about. My trial counsel also had affidavits as did Dr. Slavin. But this is, the bystander's report is different. It's a collaborative process that at the end of the day is certified by the judge. So when the judge observes that Dr. Slavin at most went up to the jury room door and where Ms. Arrigo says in her affidavit that, you know, she knelt to take a pulse and then the juror came to and, you know, appeared to be recovered as opposed to this repeated inaccuracy about Ms. Arrigo taking the juror's pulse, which didn't occur. So now we're debating what's in the affidavits. We shouldn't be doing that. What should be before this court is a bystander's report that's certified by the trial judge. And the trial judge, however, did give us the trial court's observation and in essence resolution of many of those issues when the trial judge made a detailed record, not only at the time that the court heard the motion for mistrial, but also at the time of the post-trial motion and disagreed with many of the statements that are in these affidavits that counsel relies on at this point in time. May I just, certainly. It absolutely is, Your Honor. And I believe that Campbell does not tell us otherwise. Campbell, in fact, relied on a case that this is cited in my brief and it says that the question of whether there is undue influence on the jury is a determination primarily for the trial judge. I think that's just about the exact language in that case. So there's a paragraph in Campbell that cites a number of cases, some from the U.S. Supreme Court, and the case that I, I can't remember the name of this case. It starts with a B. There's a case, a 1966 case from the 2nd District that sets out that standard. And I think when the court, if the court chooses to, or probably already has, review that case law, it's clear that what the, what the Illinois Supreme Court had in mind was not some sort of a mandatory rule that, you know, and I don't even know how that rule would be stated, quite frankly. The way counsel, or rather plaintiffs, I should say, has stated that rule is that if a physician who is a defendant gives medical care to a juror, then there necessarily has to be a new trial. I don't believe that that's the case, but in any event, the factual premise is wrong, because Dr. Slavin, as Judge Varga observed in recounting what had happened, did not give medical assistance to Ms. Fisher. And as far as there were a number of statements by counsel that the case law approves making a mistrial at any time up until verdict is not correct, in the reply brief, counsel, or rather the plaintiffs, stated that the Bower case that we cited in our brief, which sets out the principle that a timely mistrial is made before the jury starts to deliberate. And that case says that. And the DiCasolo case also supports that proposition. So that is a misstatement of the law. In fact, And in this case, the jury had begun their deliberations that evening. In this, yes. So what occurred, and this is clear from the transcript, that after the juror's situation was handled, that, you know, this again shows that necessarily that there was a discussion because Ms. Fisher was excused and everyone agreed to seat the alternate. Mr. Hardiman goes and he has his, completes his closing argument. Ms. Arrigo completes the closing argument. Rebuttal. Instruction. And Your Honor asked about how much time elapsed. I'm going to, I would think at least it would have to be an hour and a half, I would say, for all of those, for all of that to occur. But in any event, so then the jury goes back and then there's a discussion, Ms. Arrigo, well, the attorneys with Judge Varga, where the topic is, okay, you know, are we going to permit the jury to deliberate for a while yet tonight? Should we let them, I think Ms. Arrigo suggested, let's let them go to 6 p.m. And I think Mr. Hardiman didn't want to do that. And the judge said, okay, well, let's just let them get settled, pick their foreman. And, you know, we'll let them talk a little while and then we'll excuse them. And that's what happened. But yes, they started, they sat down in the room together and started talking. And in my book, that's the oration. After having been instructed. And also, as Justice Lavin noted, then the next morning, the parties, we received the motion. I don't think it says on the record exactly what time we received it, but I know what time we received it, 945, and ran over to court. And then we're back on the record again. The transcript shows at 1020. By this time, the jury surely is delivering. Wasn't there in the record that everybody agreed that they'd all leave and they didn't have to come back the next morning? That's correct. And that was, right, that's correct. Everybody, at least at that point, were in agreement. Okay, we're out of here. Right. And that's in the record as well, that Ms. Arrigo and Mr. Hardiman agreed, you know, we don't have to come over here and sit there and greet the jury or what have you. We'll just, you know, we'll just see you when we hear from the judge. Another aspect, in my view, that it's not even just waiver. This is active participation. And this is, in the DiCosolo case, I think it's pretty clear that when counsel said, when they're in their room, let's go ahead, let's seat this other juror. Fine with you, Ms. Fisher, to stay. Fine if you want to go. That's consent. That is consent to any alleged error. So it's even, I think it's even beyond forfeiture. So, you know, and as far as this business of an ex parte communication, well, plaintiffs said in their reply that the defense didn't say anything about what, quote, unquote, communications there were in the jury room. And that's not true when Ms. Fisher wasn't feeling well. Because in both Ms. Arrigo's affidavit and Dr. Slavin's affidavit, they both said, I did not have any communications with the other jurors. So that, I think, dispenses with that issue. But if there were to be any question about it, then here's how it's handled. It's handled by a voir dire, which is what the court did in the Campbell case, which I think the court is fairly clear is entirely distinguishable in terms of the way that that situation happened with the hearing of the juror. And, you know, she passes out, head is rolling back, according to the description by the Illinois Supreme Court, and, you know, winds up, you know, dropped onto the table, is taken away by paramedics, and then the judge, this makes it even further afield from our case, the judge in the voir dire after, actually it was Justice Cates who was the plaintiff's attorney in that case, after Justice Cates immediately, she wasn't a justice then, immediately objects, and there's a voir dire. And one of the voir dire questions was, did the fact that Dr. Fox gave medical treatment prejudice you? So the judge is telling him that there was medical treatment. So that's a lot different than our case. You know, I don't know what more there is to say about this. I think, you know, the case law is very clear. The standards is abuse of discretion. Judge Varga did not abuse his discretion in any of the rulings, and I don't know if the court has questions about the plaintiff's main argument or any of the other issues that are in the record. I thank the court. We rest on our briefs for the other issues and ask the court to affirm the judgment that was entered on the jury's verdict. Thank you. I'd like to address the bystander's report first. That's Rule 323. The case cited by counsel was the Harp case. It's a criminal case. I believe one of the experts hugged the victim in that case, and there was no record of that happening. There was no transcript of that. There was no transcript. There was no transcript of the post-trial motion. There was only an affidavit attached to the post-trial motion bringing that forth to the court. The Harp court did say that the standard is if there's not a sufficient record going along in the proceedings, that you can file a bystander's report. It's not mandatory. And Rule 321 allows us to file affidavits, and that becomes part of the record which we did. The Wolfe case versus Menard says that affidavits of jurors is a proper procedure to follow when there are extraneous-type events during the course of the trial. That was done here. A review of the affidavits, including a number of people, one of the jurors and an unrelated attorney, et cetera, basically paints the picture of what happened that day. The Campbell court is not about the actual medical treatment. It's about, quote, the attempt, unquote, of trying to offer assistance. Here the doctor reaches the jury room and makes a medical assessment not to proceed. There's an observation and an assessment. That's part of the essence of medical treatment, observation and assessment, and whether to proceed any further with intervention. That happened here. But, again, Campbell's about the attempt to assist a juror. And the unquestionable effect on the juror. Bauer counsel's interpretation of the decision in Bauer is not correct. Bauer did involve a factual situation where there was a discussion before deliberations of the jury, but Bauer itself says that the two bites at the apple are two verdicts that you want to avoid. Even Bauer states that. And the other cases are consistent with that. Again, Campbell, you know, we don't have to prove prejudice or intentions. It's, in my opinion, as a matter of law when this happens, that there's an unfavorable influence on the jury. As far as the deliberations beginning, if that's relevant to this court, on a supplemental record, page 643, Bauer states they didn't deliberate because we ended when did I leave, 545. So if that's relevant, this is what the judge determined, and that's consistent with my recollection, and that there were no deliberations in the morning because I presented the motion so early. Thank you. Again, I believe that all of the points that are made on appeal alone constitute reversible error, with the possible exception of the comment during closing argument in violation of the motion limiting. I think that should be probably taken in context with what happened right before then, that is, the unusual events. Keeping in mind that the theory of the case was untimely treatment, and the unusual occurrence was timely response to a medical condition. It was live. It was a live episode in front of the jury. Thank you. Okay. Thank you for the briefs and arguments, all very well done. We'll take it under advisement. And I should note that our colleague here is fully engaged in this case and was prepared to participate, but there was a family event that prevented him from being here. He will listen to the arguments and consult with us, and you'll hear from us in a couple weeks. Okay? We're adjourned.